IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2017

**STATE OF TENNESSEE v. JENNA SIMS**

**Appeal from the Criminal Court for Sullivan County
Nos. S64,777, S64,778, & S66,994    James F. Goodwin, Jr., Judge**

---

**No. E2017-00283-CCA-R3-CD**

---

The Defendant, Jenna Sims, pled guilty to multiple driving and drug offenses, for which she received an agreed-upon sentence of one-year, eleven months, and twenty-nine days. The Defendant was later placed on probation. During her probation, the Defendant left a residential treatment program and failed to return to jail, so a probation violation warrant was filed and she was charged with failure to appear. She pled guilty to the failure to appear charge and received an agreed-upon sentence of one year to be served consecutively to the remainder of her probationary sentence. At the subsequent sentencing hearing, the trial court revoked her probation and ordered her to serve her one-year sentence for failure to appear in confinement. On appeal, she argues that the trial court abused its discretion by revoking her probation and by denying her alternative sentencing. We disagree. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Stephen M. Wallace, District Public Defender; and Ashley D. Boyer, Assistant District Public Defender, for the appellant, Jenna Sims.

Herbert H. Slatery III, Attorney General and Reporter; Leslie L. Price, Senior Counsel; Barry P. Staubus, District Attorney General; and Emily M. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On May 20, 2015, the Sullivan County Grand Jury returned a six-count presentment against the Defendant in case number S64,777, charging her with reckless

endangerment, driving under the influence ("DUI"), DUI per se, possession of drug paraphernalia, speeding, and DUI third offense. See Tenn. Code Ann. §§ 39-13-103, 39-17-425, 55-8-152, 55-10-401, & 55-10-402. That same day, the Defendant was charged in case number S64,778 with DUI, DUI per se, speeding, and DUI third offense. In exchange for her plea to both cases on August 13, 2015, the Defendant received an agreed-upon sentence of one year in case number S64,777, and a consecutive term of eleven months and twenty-nine days in case number S64,778. Pursuant to the terms of the agreement, the Defendant was required to serve 240 days in jail with the remainder of the sentence to be suspended. However, she was permitted to "mitigate 110 days (55 x 2) of incarceration for inpatient rehabilitation subject to court approval."

The August 13, 2015, guilty plea transcript is not included in the record on appeal. However, we glean the following information from the technical record about the facts underlying these two cases. Regarding case number S64,777, the Defendant was pulled over on January 24, 2015, for driving ninety-four in a thirty-five mile-per-hour zone on a "wet roadway." The arresting officer, Officer Michael Still, "noticed a strong odor of alcohol coming from the vehicle[,]" and the Defendant told Officer Still that she "had two shots of Crown Royal at about 2000 hours and had later had a J[ä]ger Bomb at the bar." She also stated "that she took Zoloft but not any other drugs." The Defendant was unable to find her driver's license, so she stepped out of the car to continue looking but was still unable to find it. Officer Still "continued to detect a strong odor of alcohol coming from [the Defendant's] person." The Defendant was administered three different field sobriety tests while on the scene.

There was also a passenger in the Defendant's vehicle. Another officer, Officer Cowan,[1] spoke with the passenger, David Haskins, who stated that "he was scared and that he told her to slow down after she had run two red lights prior to being stopped."

In addition, a canine unit was called, and the dog "alerted on the vehicle." The Defendant was not allowed to return to the vehicle at that time. During the search, the officers found "a zippered pouch, in the pocket behind the passenger seat," which contained "one metal spoon, two partial drinking straws, one partial ink pen tube, two complete syringes, one push rod for a syringe and a piece of aluminum foil." According to Officer Cowan, the passenger, Mr. Haskins, "had no way of reaching the pocket where the pouch was located."

While in the back of the police car, the Defendant said that "she was having chest pain and requested that she be taken to the hospital." The Defendant "slumped over and became unresponsive" during the ride to the hospital. She was taken to Bristol Regional Medical Center for medical treatment, where a blood draw was also performed. At the

---

[1] This officer's first name is not apparent from the record.

time of her arrest, the Defendant had two prior DUI convictions—one in Indiana on December 4, 2009, and another on December 6, 2006, in Sullivan County, Tennessee.

Turning to case S64,778, Officer Christopher Odle was informed by dispatch on the evening of February 23, 2015, that the Defendant had been involved in a domestic disturbance and that she was driving "highly intoxicated" to avoid facing charges. Officer Odle located the Defendant's vehicle, which "appeared to be traveling above the posted speed limit of [twenty-five]." Officer Odle stated that he "paced the vehicle at [forty miles per hour] in a [twenty-five mile-per-hour] zone" and that he "had difficulty catching up [to] the vehicle[.]" After reaching the vehicle, Officer Odle initiated a traffic stop, and the Defendant complied. Officer Odle "smelled an odor of alcoholic beverage coming from [the Defendant's] person and her speech appeared to be slurred." The Defendant was unable to successfully complete three field sobriety tests, so Officer Odle placed the Defendant under arrest. After a search warrant was obtained because the Defendant refused to give her consent, her blood was drawn at Bristol Regional Medical Center the following morning. The Defendant's two prior DUI convictions were noted by Officer Odle in the affidavit of complaint, as well as her DUI arrest on January 24, 2015.

According to the history of supervision provided, the Defendant was granted a furlough on March 30, 2016, for her convictions in these two cases (S64,777 and S64,778). The Defendant was released from jail custody on the "special condition that she complete 110 days in the treatment program known as Bristol Road to Recovery," but if she "were to leave said program, it was conditioned that she return immediately to the Sullivan County Jail." Program Director Donna Camper reported that the Defendant left the treatment program on May 28, 2016, without permission, but the Defendant was allowed to return and was reinstated to the program over one month later on June 29, 2016. However, according to Ms. Camper, the Defendant, soon after, left the program without permission again on July 7, 2016, staying only eight days following her reinstatement. It was alleged that the Defendant did not report to the jail as instructed.

Thereafter, a violation of probation affidavit and warrant were issued against the Defendant on September 14, 2016. Specifically, it was alleged therein that the Defendant violated the conditions of her probation by leaving the treatment program without permission and failing to report to the Sullivan County Jail as instructed. Based upon this same conduct, the Defendant was charged in case number S66,994 with failure to appear, a Class E felony. See Tenn. Code § 39-16-609. On December 1, 2016, the Defendant pled guilty to the failure to appear offense and received an agreed-upon one-year sentence as a Range I, standard offender, with the trial court to consider the Defendant's request for alternative sentencing. The trial court thereafter considered the probation revocation and alternative sentencing issues jointly.

The presentence report, admitted as an exhibit, reflected that the Defendant had the two aforementioned DUI convictions on December 4, 2009, in Indiana and on December 6, 2006, in Sullivan County. She also had convictions for domestic violence, misdemeanor vandalism, misdemeanor theft, telephone harassment, possession of drug paraphernalia, unauthorized use of a vehicle, driving on an expired license, driving without a license, speeding, and violation of the financial responsibility law.

Regarding her alternative sentencing history, in December 2006, the Defendant, at the age of nineteen, was placed on probation in Tennessee for her first DUI conviction. She again received probation in February 2008 on the Sullivan County, Tennessee, vandalism offense. In December 2009, the Defendant received a probationary sentence in Indiana for her second DUI conviction, and that probation was transferred to Tennessee in August 2010. Thereafter, in March 2012, the Defendant once more received probation in Sullivan County, Tennessee, for her collective convictions for telephone harassment, theft, possession of drug paraphernalia, unauthorized use of a vehicle, driving on an expired license, and driving without a license.

Turning to the Defendant's performance while on probation, the presentence report relayed that the Defendant failed to report to her Tennessee probation officer in December 2010 and that her Indiana DUI probation was thereafter revoked in January 2011. According to the report, the Defendant also, during this same probationary period, had a positive drug screen for marijuana on October 13, 2010, and "moved without permission." Furthermore, the "petition to violate" on the Indiana DUI charge noted that it "was a second issued after the Defendant overdosed on heroin and nearly died." Regarding her probation for the telephone harassment offense, "a violation of probation was filed" on May 23, 2012, based upon the Defendant's positive drug test for marijuana. Her probation was revoked but was reinstated "with the Defendant['s] agreeing to enter the alcohol and drug treatment center U-Turn for Christ Program." However, on November 30, 2012, "a violation of probation was filed" because the Defendant failed to pay required probation fees and left the U-Turn for Christ Program without completing it. In January 2013, the Defendant was released from the Sullivan County Jail and ordered to wear a GPS monitoring device until her April 2013 sentencing hearing. In April 2013, the Defendant was ordered "into the CADAS rehabilitation program," and the sentencing hearing was reset. On February 28, 2014, the Defendant "was kicked out of the CADAS program for [a] curfew violation." Ultimately, the Defendant's probation for telephone harassment was revoked, and she "was placed on community corrections with the John R. Hay House."

The Defendant reported to the presentence officer that she graduated high school in 2005 but that her "grades were fair to poor and her G.P.A. was 0.583 at the time of graduation." In addition, she stated that she received in-school suspension for "sleeping

during class time" and averred that she "was placed into behavior modification classes." When asked about her mental and physical health at the time of the report, the Defendant claimed that both were "excellent." However, she reported that she was diagnosed with "OCD and ADD" at the age of ten and that she was suffering from depression "over her current legal situation." Upon further inquiry by the presentence officer, the Defendant maintained that she was not taking any prescribed medications, that she had not received any mental health treatment as an adult, other than drug and alcohol treatment, and that she had not used alcohol, marijuana, methamphetamine, Oxycontin, or Lortab since 2015. Regarding her employment history, the Defendant stated that she worked as a cashier at Krystal in 2016, as a cook at Cook Out in 2015, and as a laborer at the Chattanooga Choo Choo in 2013.

The Defendant's mother, Rebecca Fleenor, a registered nurse, who had custody of the Defendant's three-year-old daughter, testified on the Defendant's behalf. Ms. Fleenor stated that she was aware of the Defendant's criminal history and was asked about the circumstances of the Defendant's leaving the Road to Recovery Program without permission "the second time" on July 7, 2016. According to Ms. Fleenor, the Defendant, whose father was terminally ill, learned that he did not have long to live. When the Defendant requested permission to leave to visit her father, that request was denied. The Defendant then asked if her sister could come for a visit to comfort her, but that request was likewise denied. Ms. Fleenor explained that Program Director Donna Camper was out of town and that "the lady who was on the board really didn't know the situation." According to Ms. Fleenor, the Defendant became "very upset" because her requests were denied, so she "t[ook] a walk down the road and g[ot] kicked out." Ultimately, the Defendant's sister picked her up, and the Defendant stayed with either her mother or her sister in the following days.

The Defendant hoped to be readmitted to the program, so according to Ms. Fleenor, the Defendant contacted Ms. Camp "on several occasions." However, re-admittance was refused because this was the Defendant's second violation of leaving without permission. Ms. Fleenor testified that, after the Defendant's exit from the program, they frequently called the Sullivan County Jail but were told that there had to be a warrant for the Defendant's arrest before she could report to jail. When Ms. Fleenor was asked "[h]ow long [the Defendant] was with [her] before coming to jail," Ms. Fleenor responded, "I'm not sure of the exact time period in there; took two weeks maybe from the time [the Defendant] discovered that there was a warrant and then she just decided to turn herself in."

Ms. Fleenor was then asked to explain why the Defendant left the Road to Recovery Program the first time before being reinstated. According to Ms. Fleenor, the Defendant was at her "house for a visitation and it was [the Defendant's] job to help [her]

-5-

clean." Ms. Fleenor and the Defendant got into an argument, and Ms. Fleenor told the Defendant, "Get out. Just get out of my house. Go. Go." The Defendant left and did not come back. The Defendant showed up at her sister's house for a cook-out three or four hours later. However, Ms. Fleenor had already contacted the program by that time and told them that the Defendant had run off. According to Ms. Fleenor, "[The Defendant] did get kicked out," but "she was reinstated" and "allowed to go back."

Regarding the Defendant's prior drug treatment at U-Turn for Christ, Ms. Fleenor explained that "[i]t was a faith based program" and that she was "hoping to see a difference" in the Defendant because she was pregnant. However, Ms. Fleenor began to have reservations about the program because there were twelve or thirteen women staying in a single-wide trailer with bars on the windows and no working smoke detectors. In addition, the women were not served nutritious food, in Ms. Fleenor's opinion. On one occasion, according to Ms. Fleenor, the Defendant used Ms. Fleenor's cellphone to call her probation officer; an action that the Defendant was punished for by having to dig a five-by-five-foot hole in the yard. Ms. Fleenor confirmed that the Defendant left that program but rationalized that "[s]he almost completed" it. After leaving U-Turn for Christ, the Defendant stayed with Ms. Fleenor "for the rest of the pregnancy" and was required to wear an ankle monitor device.

Ms. Fleenor agreed that the Defendant reported to jail after giving birth. Upon the Defendant's release, she "caught new charges" and was ordered to CADAS, a drug rehabilitation program in Chattanooga. Ms. Fleenor explained that the Defendant was kicked out of that program for missing curfew, but Ms. Fleenor justified that behavior by explaining that the Defendant was only a couple of houses down watching television. According to Ms. Fleenor, the Defendant "came close" to completing that program. Ms. Fleenor confirmed that the Defendant did subsequently complete the "Hay House" program.

Ms. Fleenor asked that the Defendant be granted probation. Ms. Fleenor requested help with taking care of the Defendant's daughter and stated that she wanted to "work on the family dynamics[.]" Ms. Fleenor also thought it was important for the Defendant to get mental health treatment for her ADD and OCD and to get help for her drug problem, possibly by attending Narcotics Anonymous meetings. Ms. Fleenor prayed, "I don't excuse [the Defendant's] behavior but I would like to see what would happen if she would actually get some relief, get a little extra assistance."

On cross-examination, Ms. Fleenor acknowledged that the theft offense to which the Defendant pled guilty involved stealing from Ms. Fleenor's home. Ms. Fleenor said that she did not allow the Defendant to bring her friends over to the house anymore, and Ms. Fleenor had placed cameras and surveillance equipment around the property. In addition, Ms. Fleenor assented that the Defendant, after leaving the U-Turn for Christ

program, used methamphetamine "once" despite being pregnant. Ms. Fleenor also thought it was possible that the Defendant had been drinking after leaving Road to Recovery.

Donna Camper testified that the Defendant was "a hard worker" and "really, really want[ed] in her heart to be clean" but that the Defendant had "a hard time dealing with issues and dealing with her obsessive compulsiveness[.]" Ms. Camper noted that the Defendant loved her daughter and that the Defendant was working on building their relationship.

Regarding the first incident when the Defendant was kicked out of the Road to Recovery Program, Ms. Camper verified that the Defendant's mother called and said that the Defendant had left after an argument, and because the Defendant did not return to the program's residence by curfew, she was dismissed from the program. According to Ms. Camper, she spoke with the Defendant "maybe a week later," and the Defendant was allowed to come back to the program. Because the Defendant returned "very quickly," Ms. Camper did not alert the court at that time. Ms. Camper confirmed that the Defendant had used methamphetamine while she was away from the program and that the Defendant had to go through detox upon her return.

Ms. Camper testified that she was not at the residence when the Defendant left the second time, but she did speak with the Defendant by telephone. According to Ms. Camper, the Defendant was very upset about her father's illness, and Ms. Camper "tried to talk to her" and told her that they "would try to figure" something out upon Ms. Camper's return. However, because this was the Defendant's second infraction, Ms. Camper had no choice but to expel the Defendant from the program.

Ms. Camper agreed that there "was a lot of confusion" when the Defendant left the second time about what was supposed to happen next. Ms. Camper said that she spoke with someone at the Sheriff's Office and was told that the Defendant "had completed her time," and that Ms. Camper would have to swear out a warrant for the Defendant's arrest, which Ms. Camper did not want to do. Ms. Camper also spoke with the Defendant's probation officer "to let them know" even though the Defendant's probation "would not go into effect until" she left the program.

The twenty-nine-year-old Defendant testified. When asked why she left the U-Turn for Christ program, the Defendant said because there were cockroaches and because she was pregnant and her iron "was dangerously low" due to malnutrition. The Defendant acknowledged that she should not have left without permission but claimed that she contacted her probation officer immediately after her exit from that program. When asked about using methamphetamine while pregnant after she left U-Turn for Christ, the Defendant averred that "was a horrible, horrible, horrible mistake," but she

noted that her daughter was not born drug-addicted. The Defendant also admitted that she did not complete the CADAS program because she missed curfew by being in another resident's apartment. Again, the Defendant maintained that she contacted her probation officer immediately after being dismissed from CADAS.

The Defendant averred that she was at the Road to Recovery Program for an approximate total of seventy days. The Defendant admitted that she was dismissed from the Road to Recovery Program the first time after her mother and she had a fight and her whereabouts were unknown. However, the Defendant claimed it was "a temporary dismissal" or "like a two-week suspension type thing." The Defendant claimed that the drug test upon her return was faulty and that she had not used methamphetamine. The Defendant also relayed the details of her second exit from the program, noting that "they weren't very consistent with their rules" and that she was upset and wanted to be with her family. The Defendant thought "there was a good possibility under the circumstances" that she could go back into the program when Ms. Camper returned.

The Defendant testified that it was only ten days following her second exit that she turned herself in to the Sullivan County Jail. She claimed that she called every day to see if there was a warrant for her arrest and that, as soon as she learned that there was a warrant, she immediately turned herself in to the authorities. According to the Defendant, she had spoken with her probation officer, and she believed that, without a warrant, she could not return to the county jail.

The Defendant averred that she had completed drug and alcohol classes while in the county jail and admitted certificates to that effect. The Defendant requested that she be allowed to go and live with her mother so that she could take care of her daughter. She did not think she would have issues with her mother despite their previous disagreements. The Defendant avowed that, if released, she would agree to increased supervision, ankle monitoring, would attend drug and alcohol meetings, and obtain employment.

The Defendant admitted that she had previously violated her probation by drinking and using drugs. She relayed that she was on probation from Hay House when she committed the underlying drug and driving offenses at issue here. When asked why she had drug paraphernalia in the car during her January 24, 2015 arrest, the Defendant said it was "in case" she obtained drugs. The Defendant agreed that she had a serious drug problem and that her criminal history was the result of drug and alcohol abuse.

After the presentation of proof, the trial court, in rendering its sentencing decision, first noted the sentencing considerations outlined in Tennessee Code Annotated section 40-35-210(b). The trial court then expressed that the Defendant "ha[d] some record," and although hers was not the worst the court had ever seen, it included "drug-seeking

-8-

behavior" and convictions for DUI, reckless endangerment, vandalism, drug paraphernalia possession, domestic violence, and traffic offenses. More disturbing for the trial court was the Defendant's history of supervision, which was "one of the worst" the court had "seen in a long time for such a young person." The trial court next noted that the Defendant's probation had been revoked numerous times and that she had been given "chance after chance at rehab." According to the trial court, "past probation ha[d] been tried and tried and tried again unsuccessfully with" the Defendant. The trial court also observed that the Defendant, in the presentence report, claimed that her last drug usage was in 2015, despite evidence to the contrary. The trial court further believed the Ms. Fleenor's home was the "very worst place" for the Defendant because she was an enabler and "a trigger" for the Defendant's drug abuse.

Relying on the Defendant's prior record and repeated failed attempts at treatment and supervision, the trial court found that the Defendant had violated the conditions of her probation and revoked the balance of her one-year, eleven-month-and-twenty-nine-day sentence in case numbers S64,777 and S64,778. The trial court also denied the Defendant's request for alternative sentencing in case number S66,994. The trial court remarked that the Defendant was not an appropriate candidate for probation and that community corrections had already been tried. The Defendant filed a timely notice of appeal.

## ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether the trial court abused its discretion when it revoked her probation; and (2) whether the denial of alternative sentencing for her failure to appear conviction was an abuse of discretion. We will address each in turn.

### I. *Probation Revocation*

The Defendant contends that the trial court abused its discretion when it revoked her probation in case numbers S64,777 and S64,778. Specifically, the Defendant submits that she failed to report to jail "for a good reason[,]" that being she attempted to turn herself into the jail and there "was so much confusion" surrounding her exit from the program. According to the Defendant, she "deserves the benefit of the doubt." The Defendant also notes the circumstances surrounding her departure from the Road to Recovery Program and states that "[t]his sort of instability at the facility is not [her] fault or doing." She avers that she "did not break the law" between her leaving the Road to Recovery Road Program and reporting to jail. The State responds that the trial court properly exercised its discretion in revoking the Defendant's probation and ordering her to serve the remainder of her one-year, eleven-month-and-twenty-nine-day sentence in

confinement. The State asserts "there is ample evidence in the record to support the trial court's findings."

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of her release. Tenn. Code Ann. § 40-35-311(e). If the trial court revokes the probation, it has the right to "extend the defendant's period of probation supervision for any period not in excess of two (2) years," "commence the execution of the judgment as originally entered," or "[r]esentence the defendant for the remainder of the unexpired term to any community-based alternative to incarceration." Tenn. Code Ann. §§ 40-35-308(c), -35-311(e). In a probation revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

Furthermore, the decision to revoke probation is in the sound discretion of the trial court. State v. Kendrick, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); Mitchell, 810 S.W.2d at 735. The judgment of the trial court to revoke probation will be upheld on appeal unless there has been an abuse of discretion. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, "it must be established that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." Id. (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)); see also State v. Farrar, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011). Such a finding "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

The record contains ample proof that the Defendant violated the conditions of her probation. The Defendant admits that she walked out of the facility where she was receiving treatment because she was upset with their policies. Ms. Camper testified that she spoke with the Defendant prior to her departure and attempted to assuage the Defendant's complaints, but to no avail. According to the Defendant's mother, the Defendant waited almost two weeks after learning that a warrant had been issued for her arrest before turning herself in to the jail. In addition, the Defendant avowed that her positive drug test for methamphetamine upon her reinstatement to the Road to Recovery Program was faulty, despite Ms. Camper's testimony that the Defendant had to go through detox upon her return. What is more, the Defendant left the Road to Recovery Program not once but twice without permission. Ultimately, the Defendant pled guilty to the failure to appear offense. The Defendant continues to fail to take responsibility for actions, instead blaming the facility, the jail employees, and her probation officer. The

Defendant was likewise untruthful with the presentence officer when she claimed she had not used drugs or alcohol since 2015.

Furthermore, the Defendant's criminal history is replete with alternative sentencing violations, including obtaining new charges and failing numerous drug tests. The Defendant has been granted both probationary and community corrections sentences, and as the trial court noted, the Defendant has been given "chance after chance at rehab" and "past probation has been tried and tried and tried again unsuccessfully with" the Defendant. The Defendant nonetheless persists in using drugs and alcohol while on release into the community.

The trial court was within its discretion to determine that the Defendant violated the conditions of her probation by a preponderance of the evidence. Thereafter, it was within the trial court's authority to order the Defendant to serve the remainder of her previously imposed sentence in confinement. See Tenn. Code Ann. §§ 40-35-310, -311(e); Mitchell, 810 S.W.2d at 735.

## II. *Failure to Appear Sentence*

The Defendant, citing Tennessee Code Annotated section 40-35-103, contends that the trial court abused its discretion by denying any form of alternative sentencing for her one-year failure to appear sentence. The Defendant notes that she has "tried other probations and has successfully completed ankle monitoring and community corrections in past cases." She also submits that, "[g]iven the circumstances that led to [her] conviction, she did her best to do the right thing and not be charged" with failure to appear, including turning "herself in at the appropriate time." She maintains that the facts of the offense "are not so egregious as to constitute confinement" and that there was no proof that incarceration would provide an effective deterrent to others. Finally, she avers that her "drug and alcohol problem and her issues will not be resolved by being incarcerated for this crime." The State responds that the trial court properly exercised its discretion when it ordered the Defendant to serve her one-year sentence in confinement, citing the Defendant's extensive history of criminal convictions and repeated failures at prior alternative sentences.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-

10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing.[2] Carter, 254 S.W.3d at 347. Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

For the same reasons cited above supporting revocation of the Defendant's probation, the Defendant's argument that she is a suitable candidate for alternative sentencing pursuant to the statutory considerations outlined in Tennessee Code Annotated section 40-35-103 lacks merit. Again, the Defendant admits that she walked out of the facility where she was receiving treatment because she was upset with their policies and that this was the second time she had left the program without permission. Ms. Camper

---

[2] The Defendant incorrectly states that she is "entitled to a presumption of being a favorable candidate for alternative sentencing."

tried to work something out with the Defendant prior to her departure, but the Defendant was not amenable. Thereafter, the Defendant, according to her mother, waited almost two weeks after learning that a warrant had been issued for her arrest before turning herself in to the jail. She was also untruthful about not using drugs after 2015. The Defendant fails to be accountable for her actions.

Moreover, "an accused, already on probation, is not entitled to a second grant of probation or another form of alternative sentencing." State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999). Despite the Defendant's assertion to the contrary, her record abounds with multiple alternative sentencing violations. The Defendant has been granted both probationary and community corrections sentences and multiple, unsuccessful chances at drug rehabilitation. Even the programs she claims to have completed, she only did so after prior violations of that same probation. According to her own testimony, she was on probation from Hay House at the time she committed the underlying drug and driving offenses. Given the Defendant's repeated, unsuccessful attempts at complying with an alternative sentence, we cannot conclude the trial court erred in ordering the Defendant to serve her sentence in confinement. Accordingly, the Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the trial court's sentencing decision is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-13-